UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| ROOSEVELT WILLIAMS, | ) | Case No.: 1:10 CV 615 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| LEE LUCAS, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |


Currently pending in the above-captioned case are: (1) Defendants Robert L. Corso

("Corso"), John Ferster ("Ferster"), Anthony C. Marotta ("Marotta"), and Karen P. Tandy's

("Tandy") Motion for Summary Judgment (ECF No. 28); (2) Defendant Lee Lucas's ("Lucas")

Motion for Summary Judgment and/or Motion to Dismiss on Qualified Immunity Grounds (ECF No.

29); (3) Defendant Robert Cross's ("Cross") Motion for Summary Judgment with Respect to *Bivens*

Claims (ECF No. 30); (4) Defendant Thomas Verihiley's ("Verihiley") Motion for Summary

Judgment with Respect to *Bivens* Claims (ECF No. 31); (5) Defendant Sheriff J. Steve Sheldon's

("Sheldon") Motion for Summary Judgment (ECF No. 32); (6) Defendant Captain Larry Faith's

("Faith") Motion for Summary Judgment (ECF No. 33); (7) Defendant Sergeant Matt Mayer's

("Mayer") Motion for Summary Judgment (ECF No. 34); and (8) Defendant Charles Metcalf's

("Metcalf") Motion for Summary Judgment (ECF No. 35).  For the following reasons, this court

grants in part and denies in part Defendant Lucas's Motion for Summary Judgment and/or Motion

to Dismiss on Qualified Immunity Grounds (ECF No. 29), grants in part and denies in part Defendants Corso, Ferster, Marotta, and Tandy's Motion for Summary Judgment (ECF No. 28) ,and grants all of the other Motions.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The Mansfield Investigation

This case arises out of a criminal case instigated against Plaintiff Roosevelt Williams ("Williams" or "Plaintiff") for alleged violations of federal criminal drug laws.  In early 2005, law enforcement officers in Mansfield, Ohio began to investigate sales of crack cocaine and named this investigation "Operation Turnaround."  On January 21, 2005, Defendant, Jerrell Bray executed a Confidential Operative Agreement with the Richland County Sheriff's Department, in which he agreed to assist the Sheriff's Department as a "confidential operative" in Operation Turnaround. From February to August 2005, Operation Turnaround only involved the Richland County Sheriff's Office.  In late-August to early-September 2005, the Drug Enforcement Agency and the Ohio Bureau of Criminal Identification and Investigation became involved with the investigation.

### B.  Jerrell Bray's Involvement in the Mansfield Investigations

#### 1.  The Concerns with Bray's Control

On February 10, 2005, Detective Dawn Brown approached Defendants Metcalf and Mayer and expressed concern that Metcalf and Mayer permitted Bray to turn the recording equipment on and off, that Metcalf and Mayer did not know where Bray was during an alleged drug transaction, and that after a controlled buy occurred, Metcalf and Mayer did not continue to monitor Bray after he left the scene.  (Ex. 5, Messer Depo., Ex. A at 12.)  Detective Brown maintains that Defendants Metcalf and Mayer agreed to stop using Bray as an informant except in very specific circumstances

-2-

and that she later learned that these Defendants continued to use Bray as an informant despite this agreement.  (Ex. A at 13.)

### 2.  The GPS

On March 12, 2005, Bray claimed to have bought a little over five grams of crack and a .38 caliber pistol from Tyron Brown and Jason Westerfield.  (Ex. 2, Sealed Docs. at 000019.)  On March 15, 2005, Bray again claimed to have purchased a little over five grams of crack from Jason Westerfield.  (*Id*. at 000020.)  Westerfield wore a type of GPS tracking device.  Defendant Metcalf reported that he could see Bray and Westerfield during the March 15 buy.  (Ex. 2, Sealed Docs. at 010857.)  The records from this GPS show that Westerfield was not at the scene of the alleged March 12 and March 15, 2005 drug transactions.

### 3.  The Hidden Compartment

On March 31, 2005, Bray was arrested and charged with possession of crack cocaine.  The crack cocaine was hidden in a compartment within the steering wheel of Bray's car.  (Ex. 1, Lucas Tr. at 371-74.)

### 4.  The Stand-In, Part 1

Bray was given money to purchase drugs from Noel Mott.  On September 6, 2005, Bray met up with a man, named Jim Williams, and returned with crack cocaine for which he spent $750.00. During the drug transaction, the person who sold Bray the crack cocaine gave Bray his phone number.  (Ex. 3, Sealed Audio, DM200006 at 8:45.)  This number is listed as belonging to Darren Transou; someone positively identified Transou's voice as the person on the tape of the drug buy; additionally, Transou lived at the address that Bray went to for the buy.  (Ex. 2, Sealed Docs. at

017900; *Id*. at 017899; *Id*. at 017898.)  Nonetheless, Bray maintained that he bought crack cocaine from Noel Mott on September 6, and Mott was prosecuted for this transaction.

### 5. The Stand-In, Part 2

Bray told the officers involved in Operation Turnaround that he was going to transport Noel Mott to Detroit to buy drugs and that Mott would have $36,000 of cash with him.  (Ex. 2, Sealed Docs. at 014353.)  A plan was hatched between law enforcement and Bray for Bray to transport Noel Mott and Arrico Spires to Detroit to pick up two kilograms of cocaine and bring it back to Mansfield.  (Ex. 5, Messer Depo., Ex. A at 34.)  Bray was to drive Mott and Spires to Detroit in one vehicle and for Bray to wear a wire.  (*Id*.)  Law enforcement planned to stop the car on its way to Detroit, but Bray did not know this. (*Id*.; Ex. 1, Lucas Tr. at 177.)

This plan changed.  Bray and officers of Operation Turnaround agreed to allow Bray to follow Mott and Spires in a separate vehicle.  (Ex. 5, Messer Depo., Ex. A at 34.)  Bray was driving a white Saturn, and the two other persons, who were supposed to be Mott and Spires, were driving a green Bronco. (Ex. 1, Lucas Tr. at 171-76.)  An Ohio Highway Patrol officer pulled over the green Bronco and the white Saturn, and inside the green Bronco were Darren Transou and his girlfriend, Crystal Dillard.  (Ex. 5, Messer Depo., Ex. A at 34-5.)

Officers wrote conflicting reports on the incident.  Lucas wrote a report that stated that Bray told the officers that he would be following Transou because Mott had left ahead of him earlier in the day. (Ex. 2, Sealed Docs. at 002835.)  This is contradicted by METRICH[1] Sergeant Nicholson's report, which states that he only found out that Transou and Dillard, rather than Mott and Spires,

---

[1]      METRICH is the Metro-Richland County Enforcement Unit, a consortium of Richland County law enforcement agencies that investigate drug-related cases, who participated in Operation Turnaround.

-4-

were in the car when the Ohio State Patrol who pulled them over called Defendant Metcalf and told him.  (Ex. 5, Messer Depo., Ex. A at 34-35.)  When Lucas testified before the grand jury, which indicted Mott and others, he said that when Officer Wolf pulled over the green Bronco, Noel Mott was inside.  (Ex. 2, Sealed Docs. at 000026.)

### 6.  The Stand-In, Part 3

On September 9, 2005, Darren Transou met Bray at Eastgate Apartments driving the same green Bronco that he was pulled over in  two days earlier. (Ex. 1, Lucas Tr. at 933-934, 991, 999.) Two women, Cheryl Kleer and Crystal Dillard, also arrived driving a black Toyota Corolla.  (*Id*. at 972.)  Bray had been instructed to buy drugs from Lowestco Ballard and claimed that he did so.  The drug deal was videotaped.  The person in the video who Bray bought drugs from was not Lowestco Ballard.  Arrico Spires identified Darren Transou as the man who sold drugs to Bray that day.  (Ex. 2, Sealed Docs. at 002918.)

### 7.  The Stand-In, Part 4, Plus Stealing Money

On September 15, 2005, Bray was provided with $2,400.00 of drug buy money with the serial numbers previously recorded, in order to purchase crack cocaine from Noel Mott.  (Ex. 2, Sealed Docs. at 002843.)  Bray arranged for Darren Transou to stand in for Noel Mott in order to stage the buy.  (Ex. 1, Lucas Tr. at 387.)  Bray paid Transou $1,620.00 for the drugs and counted the remaining money out loud.  (Ex. 1, Lucas Tr. at 395-97.)  Bray hid the remaining $780.00 in a secret compartment behind the radio in his car.  (*Id*. at 212-14.)  Bray claims on the recording that Mott wanted $2,500.00 for the drugs but that the deal went down for $2,420.00 because he, Bray, threw in $20.00 of his own money just to make sure the deal would not "go sour."  (Ex. 3, Sealed Audio, N05-T2 at 0:28.)

Upon returning to the station, Defendants searched his car and found $780.00 of the buy money in a compartment behind the radio of Bray's car.  Bray, Lucas, and Verhiley discussed the money on tape.  (Ex. 3, Sealed Audio, N05-T2 at 9:05-9-15.)  Lucas's DEA report makes it seem like Bray returned the money before being searched. It reads, "[t]he CS [Bray] returned the remaining $780.00 OGF to S/A Lucas.  The CS and his/her vehicle were again searched with negative results-for any drugs or money."  (Ex. 2, Sealed Docs. at 002844.)

### 8. The Buy with Dwayne Nabors

On September 20, 2005, Defendant Bray and Task Force Officer, Jamaal Ansari, made an undercover buy allegedly from a man, named Dwayne Nabors, for $10,000.  The drug deal took place in three stages. First, Bray and Ansari met Nabors at Nabors's business. Bray, Lucas, Ansari, and Metcalf reported that this meeting occurred.  (Ex. 2, Sealed Docs. at 002855.)  Lucas wrote in his report that he and Metcalf observed Nabors and an unidentified man driving a Cadillac registered to Albert Lee.  (*Id*. at 002855.)  The phone from which someone called Bray for the drug deal was previously used by Albert Lee.  (*Id*.)  The person on the phone with Bray offered to sell his "Cutty," short for Cutlass, to Bray, and title from Albert Lee's 1987 Oldsmobile Cutlass Supreme was transferred to Bray six days after this drug deal.  (Ex. 3, Sealed Audio, N8C-T2; Ex. 2, Sealed Docs. at 003113-14.)

The second stage of the deal took place near the corner of West Fourth St. and Pleasant Ave. in Mansfield, Ohio.  Audio for this alleged deal was not recorded.  Lucas states in his report that:

> Metcalf and Sgt. Mayer observed the black Cadillac, Ohio tag number DOJ-4305, being driven by a different unknown black male arrive and park near the CS' vehicle. The CS exited the vehicle and met with the male. At this-time, Tyron BROWN, Maurice GORDON and a thin unknown black male all approached the CS and TFO Ansari. . . . At

-6-

> approximately 3:55 PM, TFO Ansari observed this male give the CS a Crown Royal bag (N-7) that contained approximately 130.6 gross grams of crack cocaine (EX-7-A). S/A Lucas and Det. Brown drove by this meeting and S/A Lucas observed the CS toss the buy money into the black Cadillac.

(Ex. 2, Sealed Docs. at 002855-56.)  These events were not recorded by the video camera, which was controlled by Metcalf and Mayer.

The final stage of the deal is not recorded on video but took place inside 460 Hill St.  (Ex. 2, Sealed Docs. at 002856-57.)  Albert Lee's Cadillac is registered at 460 Hill St.  (*Id*. at 003112.) According to Lucas' report, Nabors's Cadillac was also present at 460 Hill St.  (*Id*. at 002856.)

### C.  Williams's Criminal Case

The November 9, 2005 Indictment charged Roosevelt Williams as follows:

> Count 1 - did knowingly and intentionally distribute five grams or more of a mixture or substance containing a detectable amount of cocaine base (crack) on July 19, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B);
> Count 2 - did knowingly and intentionally distribute five grams or more of a mixture or substance containing a detectable amount of cocaine base (crack), on August 4, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B);
> Count 3 - did knowingly and intentionally distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base (crack) on October 5, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and
> Count 4 - did knowingly and intentionally distribute cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1), within 1,000 feet of Madison Jr. High School on July 19, 2005.

(Grand Jury Indictment, ECF No. 30-2.)

### 1.  The July 19, 2005 Buy

Bray was involved with this buy.  DEA agents were not.  The details of how this buy was orchestrated are not on the record.  Williams pled guilty to selling five grams of crack cocaine on July 19, 2005, which was Count I of his Indictment.

### 2.  The August 4, 2005 Buy

Bray was involved with this buy.  DEA agents were not.  Again, details of how this buy was orchestrated are not on the record.  Count II  was dismissed after Williams pled guilty to Count I.

### 3.  The October 5, 2005 Buy

Agent Lee Lucas wrote in an initial report (Ex. 2., Sealed Docs. at 002866), that at 4:24 p.m. on October 5, 2005, Bray had a "direct connect" conversation with Roosevelt Williams.  Lucas identifies Williams and states that he is standing next to a particular car near a Dairy Queen, where Williams allegedly sold Bray 2 ounces of crack cocaine. (*Id.* at 002866, 002867.) In a report by Perry Wheeler, a METRICH officer, he stated that the suspect, Roosevelt Williams, got into the car with Bray and Lucas and conducted a drug deal.  Afterwards, Williams left in a black Buick.  Wheeler checked the Buick's license plate and determined that the car belonged to Bray.  He notified Lucas of his findings.  He learned later that Lucas had told Captain Faith that he was positive that he purchased crack cocaine from Roosevelt Williams.  (Ex. 5, Messer Depo., Ex. A at 37-38.)  In Lucas's second report regarding the purported buy on October 5, 2005, Lucas did not mention that Wheeler told Lucas that the suspect was not Williams. (Ex. 2, Sealed Docs. at 017831-33.)  Lucas states in his second report that he, Metcalf, and Verhiley witnessed the deal with Williams.  (*Id.* at 017832.)  Lucas further stated in his second report that Williams was driving a "Cutlass," not a Buick.  (*Id.*)  In addition, the direct connect number used by Bray to contact Williams for the buy

-8-

was 136-101-20755, which is registered to someone named Robert Lloyd, not Williams.  (Ex. 2, Sealed Docs. at 003066-68.)

At an interview with Lucas and Ansari on November 21, 2005, Williams told them that Williams was on a Southwest Airlines flight to Chicago during the purported buy on October 5, 2005, and therefore could not have sold crack cocaine on that date.  After reviewing a copy of Williams's boarding pass and the flight manifest for that flight, the government dismissed Count III of the Indictment.

During Lucas's criminal trial, Bray testified that he had arranged for a man, named Robert Harris, to play the part of Williams.  (Ex. 1, Lucas Tr. at 248-51.)  On June 8, 2006, Defendants Cross and Verhiley, along with Assistant U.S. Attorney Blas Serrano, interviewed Harris, and as Harris began to tell Defendants about a drug transaction, during which he helped Bray frame someone, the Defendants terminated the interview.  (Ex. 2, Sealed Docs. at 002924-002925.) Defendants stated that they "believed HARRIS was being untruthful" and terminated the interview "[a]s a result."  (*Id*. at 002925.)

Williams entered into a plea agreement on April 10, 2006, in which he pled guilty to Count I, the July 19, 2005 drug transaction.  The remaining Counts were dismissed.

### 4. Dismissal of Williams's Criminal Case

Bray pleaded guilty to two counts of perjury and five counts of deprivation of civil rights with respect to his actions in the investigation of Williams and other people in the Mansfield, Ohio area. On November 9, 2007, Williams filed a Motion for a New Trial.  On March 3, 2008, the United States filed a Motion for Leave of Court to Dismiss, in which it did not oppose Williams' request to withdraw his guilty plea and asked that the matters be dismissed.  On March 27, 2008, the United

States District Court for the Northern District of Ohio granted the Motion for Leave of Court to Dismiss.

### D.  Procedural History

Plaintiff's Complaint alleges: (1) *Bivens* Causes of Action Against Federal Actors; (2) violation of 42 U.S.C. § 1983; (3) Conspiracy Under *Bivens* and 42 U.S.C. § 1985; (4) Abuse of Process; (5) Malicious Prosecution; (6) Intentional Infliction of Emotional Distress; (7) Negligent Infliction of Emotional Distress.  (Compl., ECF No. 1.)  Motions for Summary Judgment were filed on January 21 and January 28, 2011 by the various Defendants.  Defendants maintain that they are entitled to qualified immunity on all of Plaintiff's constitutional claims.

In Plaintiff's Response to Defendants' Motions for Summary Judgment, Plaintiff has reduced his claims to the following[2]: (1) Fabricating Evidence pursuant to 1983 (subsumed in Counts I, II, and III of the original Complaint); (2) Malicious Prosecution pursuant to § 1983 (subsumed in Count V); (3) *Brady* violations (subsumed in Counts I, II, and III) ; and (4) a claim pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), against Richland County, the Richland County Sheriff's Office and Sheriff Sheldon (indicated by each allegation made against county officials).[3] In his amended complaint, Plaintiff voluntarily dismissed Defendant Tandy from the lawsuit.

---

[2]     This interpretation to Plaintiff's position is verified in Plaintiff's Motion for Leave to File First Amended Complaint, which Plaintiff filed after Defendants filed their Motions for Summary Judgment. The court denied this Motion, inasmuch as the proposed Amended Complaint was only meant to clarify existing claims and eliminate others.

[3]     A *Monell* claim is made against a local government, not an individual.  *Monell*, 436 U.S. 658.  Thus, the court construes his *Monell* claim to be against Richland County and the Richland County Sheriff's Office, not Sheriff Sheldon in his individual capacity.

Plaintiff filed his Opposition on May 6, 2011.  In his Opposition, Plaintiff addressed the substantive claims in the Motions to Dismiss[4] and for Summary Judgment and did not ask for further discovery pursuant to Federal Rule of Civil Procedure 56(f).  Therefore, the court will proceed with analyzing the merits of Defendants' Motions.

### E.  Narrowing the Scope of Plaintiff's Case

As stated above, Williams was charged with conducting three drug transactions, one in July 2005, one in August 2005, and one in October 2005.  Williams discussed the first two transactions during Lucas's criminal trial.  Williams testified that he sold drugs to Jerrell Bray on 15 or 16 occasions. (Williams testimony, Lucas transcript, at 2054, ECF No. 35-5 ("Q. And are you able to estimate, to the best you can, how many times you sold drugs to Mr. Bray? A. Close to about 15, 16 times, something like that.")).  Williams testified that the first two sales with which he was charged occurred in July and August of 2005 and that the sales were to Bray.  He said:

> Q. Okay. And the drug buys themselves, so there were three different sales you were charged with, is that correct?
> A. Yes, sir.
> Q. And the first two were smaller quantities, is that what you're saying?
> A. Yes, sir. . . .
> Q. And let's start with the -- do you recall when it was you were supposed to have made these sales?
> A. Yes.
> Q. Okay. What do you recall about that, sir?
> A. I remember the first two sales when they took down, it was a housing project in right when I came back, right when I came back to town. It was on Mulberry at a house.
> Q. What time of year would that have been?
> A. That was in July, between July and, like, the first part of August.

---

[4]     Defendant Lucas filed a Motion for Summary Judgment and/or Motion to Dismiss (ECF No. 29).  The other Defendants filed Motions for Summary Judgment only.

(*Id.* at 2056-57; *see also Id.* at 2058 ("Q. Did you admit knowledge that you, in fact, did do sales like that to Mr. Bray? A. Yes, sir.").)  Williams testified that he pled guilty to selling to Bray in July and August because he was, in fact, guilty.  (Williams testimony, Lucas transcript, at 2077, ECF No. 35-5 ("Q. And when you pleaded guilty to those two counts in July and August of 2005, you pleaded guilty because you were guilty? A. Yes, sir.").)

Nonetheless, Williams stated in his Motion for a New Trial that he would not have pled guilty had he had exculpatory evidence.  (Ex. 2, Sealed Docs. at 010372.)  Given the fact that Williams stated under oath during a criminal trial that he would have pled guilty anyway, however, the court accepts this as true.  Therefore, because Williams has admitted his guilt for the first two drug transactions on the record and admitted that the reason why he pleaded guilty to the July 2005 count was because he was guilty, his claims for malicious prosecution, fabrication of evidence, and *Brady* violations, all must relate to the October 2005 transaction.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. . . .

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.*

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more

-13-

than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts.  *Id*.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## B.  Qualified Immunity

Qualified immunity protects an official from liability if the official's conduct does not violate "clearly established" statutory or constitutional rights that a reasonable person would have known were in existence.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has stressed that the  "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  *Id*. (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985)).  Rather, it means that, "in light of pre-existing law the unlawfulness must be apparent."  *Anderson*, 483 U.S. at 640.  *E.g.*, *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986); *Mitchell*, 472 U.S. at 528; *Davis v. Scherer*, 468 U.S.183 (1984).

A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority.  *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).  However, the plaintiff bears the ultimate burden of proof to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991).  "[T]he burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right."  *Spurlock v. Satterfield,* 167 F.3d 995, 1005 (6th Cir. 1999).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court held that, in addressing the issue of qualified immunity, a court must first determine whether there is a violation of a constitutional right before addressing the issue of whether the right was clearly established.  While this approach may be appropriate in many cases, it is no longer mandatory.  The Supreme Court modified this approach in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  District and circuit court judges are allowed the freedom to determine which prong of the immunity analysis to address first. *Id.* at 821; *see also Waters v. City of Morristown*, 242 F.3d 353, 360 (6th Cir. 2001) (A plaintiff must: (1) identify a violation of a clearly established constitutional right; and (2) show that the officer acted in an objectively unreasonable manner.).  It should also be noted that some panels of the Sixth Circuit have applied a third step, involving the sufficiency of the evidence.  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  This step requires "the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established right." *Id*.

### III.  LAW AND ANALYSIS

As stated above, in order to overcome a qualified immunity motion, a plaintiff must show: (1) the facts, taken in the light most favorable to plaintiff, "show the officer's conduct violated a constitutional right," and (2) the right was "clearly established." *Saucier* 533 U.S. at 201.

### A.  Whether the Rights Allegedly Violated are "Clearly Established"

**1. Fabrication of Evidence**

The Sixth Circuit held "that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville,* 444 F.3d 725, 737 (6th Cir. 2006) citing

-15-

*Stemler v. City of Florence,* 126 F.3d 856, 872 (6th Cir.1997).  A criminal defendant's right to be free from arrest or detention when probable cause does not exist is a clearly established right.  *See Williams v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004); *Rothhaupt v. Maiden*, 144 F. App'x 465, (6th Cir. 2005).  Therefore, the cause of action for fabrication of evidence protects a clearly established right.

**2.  Malicious Prosecution**

Malicious prosecution is a recognized federal claim.  *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) (recognizing malicious prosecution as a "cognizable claim . . . under the Fourth Amendment.")  The Court in *Thacker* explained that, "[a]though this Court has yet to resolve the elements of a federal malicious prosecution claim, it is clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'  *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001)).  Therefore, the cause of action for malicious prosecution protects a "clearly established" right.

**3.  *Brady* Violations**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The Sixth Circuit has extended this obligation to police officers, reasoning that "*Brady* . . . would impose hollow obligations indeed if the Constitution did not also preclude police officers from concealing the same evidence that they are not permitted to destroy and that the prosecutor is required to disclose." *Moldowan v. City of Warren*, 578 F.3d 351, 380 (6th Cir. 2009).  The Court explained that, "[a]s far as the Constitution is concerned, a criminal defendant is equally deprived

-16-

of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same." *Id.* at 379.  Therefore, the Constitutional right to not have police officers suppress exculpatory evidence, as generally recognized in *Brady*, 373 U.S. at 87, is clearly established.

### B.  Fabrication of Evidence and *Brady* Violation Claim

### 1.  Fabrication of Evidence

When "evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have effected the decision of a jury," a plaintiff can prevail on a claim of fabrication of evidence under § 1983.  *Gregory*, 444 F.3d at 737; *see also Higazy v. Templeton*, 505 F.3d 161, 176 (2d. Cir. 2007) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d. Cir. 2000)) ("'[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.'").  As articulated in *Richardson v. Nasser*, No. 08-12951, Sl. Cop., 2009 WL 4730446, *6 (E.D.Mich. Dec. 9, 2009)., "a plaintiff must prove that (1) a fabrication of evidence occurred and (2) the defendant was aware of the fabrication. Even then, not all cases of fabrication of evidence are actionable. If the fabricated evidence does not effect a jury's decision, a plaintiff cannot prevail."

Williams's criminal case did not go before a jury. As indicated above, the charges against Williams flowing from the fabricated evidence were eventually dismissed, inasmuch as he was never convicted as a result of that evidence. His claims are without merit. Thus, all Defendants are entitled to summary judgment on this claim.

### 2.  *Brady* Violation

-17-

The Constitution does not require the government to disclose impeachment information to a defendant prior to the defendant entering a plea. The Supreme Court in *United States v. Ruiz*, 536 U.S. 622, 633 (2002), stated that, "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." The Court reasoned that, "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." *Id.* at 631.

Furthermore, as Judge Patricia A. Gaughan from this court stated in *Westerfield v. Lucas*, another case arising out of Operation Turnaround, that "termination of the underlying criminal case in favor of the accused forecloses a *Brady* claim." *Westerfield v. Lucas*, No. 1:07 CV 3518, Sl. Cop., 2011 WL 1831676, *7 (N.D. Ohio May 12, 2011) (citing *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988)).

Therefore, as to Count III, the charge involving the October 5, 2005 drug transaction, terminated in Williams's favor, Williams cannot prevail on a *Brady* claim in this case. All Defendants are entitled to summary judgment on this claim.

### C.  Application of Malicious Prosecution Claim to Each Defendant

Not all Defendants were involved with the criminal investigation of Williams to the same degree. However, Plaintiff maintains that all of the Defendants should have known that Bray was a faulty informant and therefore should have ensured that all officers stopped using Bray as an informant long before October 2005. Some Defendants maintain that they were not involved with

the October 2005 drug transaction. Other Defendants maintain that they were involved but did not act unreasonably or wrongfully. The court will address each Defendant in turn.

## 1. Defendant Lee Lucas

Lucas became involved with the Mansfield investigation in September 2005. According to Lucas, "DEA's role in the Mansfield investigation lasted only about two months, from September to November of 2005, after which arrests were made and a number of premises searched." (Def. Lucas's Mot. to Dismiss and for Summ. J., at 7, ECF No. 29.) Thus, Lucas was not involved in the July or August drug transactions, but he was involved with the October 5, 2005 transaction.

To prevail on a federal claim for malicious prosecution premised on a violation of the Fourth Amendment, Plaintiff must prove the following: (1) that a criminal prosecution was initiated against Plaintiff and that the Defendants "'ma[d]e, influence[d], or participate[d] in the decision to prosecute;'" (2) "that there was a lack of probable cause for the criminal prosecution;" (3) that the plaintiff suffered a deprivation of liberty as a result of a legal proceeding; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir.2007)) (citations omitted).

Lucas argues that he had probable cause to arrest Williams. Lucas argues that the probable cause is based on information from a trusted informant, Bray. Probable cause may be based upon information from a reliable, known informant or information from an independent source that can be independently corroborated. *Draper v. United States*, 358 U.S. 307, 312–13 (1959). Lucas maintains that at the time of the investigation of Williams, Lucas believed that Bray was trustworthy. Plaintiff argues otherwise and relies on the list of events discussed in the facts above.

Lucas also maintains that probable cause existed because a grand jury returned an indictment for Williams.  The Sixth Circuit has held that, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 n.13 (6th Cir. 2005) (citation omitted); *Cook v. McPherson,* 273 F. App'x 421, 423 (6th Cir. 2008) ("Plaintiff's indictment is dispositive of his § 1983 malicious prosecution claim."); *Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005); *Hubbard v. Gross*, 199 F. App'x 433, 441 (6th Cir. 2006). An exception to this rule exists; however, if "false statements or misrepresentations by law enforcement officials during the criminal proceeding"occurred, then this prevents a finding of probable cause. *Shipp v. U.S.*, 212 Fed.Appx 393, 399 (6th Cir. 2006) (citing *Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002)); *see also McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). Plaintiff maintains that although he does not have the grand jury transcript at this point, "it is difficult to see how a Grand Jury could have indicted Williams for the October 5, 2005 deal, unless Defendants lied and testified that he was there." (Pl.'s Opp. to Summ. Judg., at 45, ECF No. 44.)  Notably, Lucas does not argue that he did not testify before the grand jury.

If Lucas testified to the grand jury, or one of his reports that implicated Williams for the October 5, 2005 drug transaction was presented to the grand jury, then Lucas is not entitled to qualified immunity for the malicious prosecution claim.  As further discovery is needed to resolve this factual issue, the court hereby denies Lucas's request for qualified immunity for the malicious prosecution claim. This is without prejudice to Lucas's renewal of the Motion if he deems it appropriate, should discovery reveal that neither her nor his report implicate Williams' before the grand jury regarding the October 5, 2005 transaction.

**2. Defendant Charles Metcalf**

Defendant Metcalf was a detective in the Richland County Sheriff's Office and was involved in an investigation of drug trafficking in the Mansfield, Ohio area.  Metcalf was involved with the alleged buy on October 5, 2005.  Metcalf was responsible for security and surveillance.  He was unable to observe Bray and Lucas during the drug transaction and did not see the individual who was the target of the buy.  (Metcalf Testimony, Lucas Trans., at 1798–99, ECF No. 35-6 ("A. I was parked, as near as I can remember, off to the side. And they had parked on the east side where I couldn't see what was going on."); *Id.* at 1683–84 ("Q. Did you see the target individual known as -- thought to be Roosevelt Williams? A. No.  Q. Did you see anyone get into the car that Mr. Bray and Lucas were driving? A. No.  Q. Did you see anyone get out of the car that Mr. Bray and Mr. Lucas were driving? A. No.").)  After the transaction, Metcalf learned from Lucas that Detective Perry Wheeler had expressed doubts about the identification of the target.  As a result, Lucas asked Metcalf for a photograph of Williams, and after Lucas reviewed that photograph, he confirmed to Metcalf that the target was Williams.  Metcalf never spoke with Detective Wheeler.

Plaintiff argues that Metcalf's role in the October 2005 drug transaction was significant.  Plaintiff argues that,

> Bray, Metcalf, Lucas, Cross, and Verhiley all claimed to have personally seen Williams deal drugs on October 5, 2005, even though he was not there. Then they, and the other Defendants, who by April 2006, when Williams pled guilty, knew that Williams was innocent of the October 5, transaction, kept silent as Roosevelt Williams was forced, under threat of life in prison, to plead guilty to a lesser offense.

(Pl.'s Opp., at 48, ECF No. 44.)  Plaintiff's points to Lucas's Report of Investigation dated October 5, 2005, in which Lucas states that "WILLIAMS was also observed by Det. Metcalf and TFO Verhiley" and that Metcalf observed WILLIAMS walk over to the vehicle that Bray and Lucas were

-21-

in and get into the back passenger seat and leave the car later.  (Ex. 2, Sealed Docs. at 017832.)

Plaintiff also points out that on May 14, 2009, Defendant Metcalf entered a plea of guilty to an

Information charging that Metcalf:

> did willfully deprive Dwayne Nabors of the right to due process of law and not to have false evidence knowingly presented against him, as is guaranteed by the Fifth Amendment to the Constitution and the Laws of the United States, in that, while testifying as a detective for the Richland County Sheriff's Office and on behalf of the United States of America, the defendant, CHARLES METCALF, declared that the meeting referenced in Paragraph 4, above, had not been videotaped, and that after said meeting he and LML, another law enforcement officer, positioned themselves in such a manner as to allow for both officers to positively identify Dwayne Nabors as being a participant; whereas, the defendant, CHARLES METCALF, well knew and believed that said meeting had been videotaped, and that he and LML had not positioned themselves so as to allow for an identification of Dwayne Nabors.

(Docket of *United States v. Metcalf*, Ex. 1, at Ex. 11; Information in *United States v. Metcalf*, Ex.

1 at Ex. 12, at pp. 2-3.)

Metcalf maintains that he never identified Williams as participating in the October 5, 2005

drug transaction.  Instead, Metcalf argues:

> [t]he record clearly indicates that Special Agent Lucas and Jerrell Bray identified the involved party as Roosevelt Williams. Detective Perry Wheeler disagreed. Detective Metcalf was asked to locate a known photo of Roosevelt Williams for Agent Lucas to review. Detective Metcalf did so. Detective Metcalf did not identify the individual involved in the October 5, 2005 deal as Roosevelt Williams. Providing a photograph for review does not amount to conduct which a reasonable officer would have known violated anyone's constitutional rights. Nothing submitted by the plaintiff suggests that Detective Metcalf violated Williams' constitutional rights or that Metcalf should be stripped of qualified immunity.

(Metcalf's Reply, at 11, ECF No. 54.)

Bray testified at the criminal trial of Lucas that he intentionally misidentified subjects and that he made the decision to do this on his own, not with law enforcement officials.  (Bray Testimony, Lucas Trans., at 342, ECF No.35-3 ("Q. And you indicated -- today I believe you're indicating that the stand-in situation was done by you and you alone, correct? A. Yes, sir, it was.").  Metcalf testified at Lucas's trial that he did not suspect that the drugs being obtained during the deals were drugs that belonged to Bray or that Bray was using stand-ins.  (Metcalf Testimony, Lucas Trans., at 1741–42, ECF No. 35-4.)

Metcalf also argues that Plaintiff's malicious prosecution claim against him fails because a grand jury indicted Plaintiff.  An indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.  *Higgason*, 288 F.3d at 877.  Metcalf maintains that he did not testify before the grand jury.  Lucas's report stating Metcalf's involvement in the October 2005 transaction is the only indication of Metcalf involvement in the October 2005 transaction. Lucas's report does not establish Metcalf's liability for malicious prosecution, as the report, if submitted to the grand jury, was written by Lucas.  In addition, Plaintiff does not state that Metcalf wrote any reports that fabricated evidence that could have been presented to the grand jury.  Thus, although Plaintiff does not have a copy of the grand jury transcript, Plaintiff has not presented any evidence that Metcalf could have influenced the grand jury in any way.  (Pl.'s Opp., at 45, ECF No. 44 ("Plaintiff has not been provided with the Grand Jury transcript of the proceedings wherein Plaintiff Williams was indicted.").)  Summary judgment is hereby granted in favor of Defendant Metcalf.

### 3.  Defendants Robert L. Corso, Anthony C. Marotta, Karen P. Tandy and John Ferster

-23-

Defendants Corso, Ferster, and Marotta are all DEA supervisors. Each of these Defendants maintain that they did not directly participate in the supervision of Bray, Lucas, Cross, or Verhiley in the investigation and prosecution of Williams.

The Sixth Circuit in *McQueen v. Beecher Community Schools*, 433 F.3d 460, 470 (6th Cir. 2006), held that "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." In order to show supervisory liability, a plaintiff must "show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982)). The court also stated that, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee*, 199 F.3d at 300 (quoting *Hays*, 668 F.2d at 874). *See also Cardinal v. Metrish*, 564 F.3d 794, 802-03 (6th Cir. 2009) (quoting *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir.2002)) ("We have held that, even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'").

### a. Robert Corso

Corso is a Special Agent with the DEA, who was the Special Agent in Charge of DEA's Detroit Field Division in 2005. He maintains that he did not participate in the supervision of Bray as an informant or in the supervision of any criminal investigation in which Bray participated. Therefore, he argues that he was not aware of any constitutional violation or criminal action

committed by Bray or any of the alleged constitutional violations made by Defendants Lucas, Cross,

or Verhiley.  In his Declaration, Corso states that,

> [a]t no time during the investigation and prosecution of Roosevelt
> Williams . . . was I aware of, or have knowledge of, a decision by the
> Richland County Sheriff's Office to commence an investigation into
> drug trafficking in the Mansfield, Ohio area in 2004 and/or the
> development by the Richland County Sheriff's Office of a list of
> individuals who became designated as targets of the investigation.

(Corso Decl., ¶ 6, ECF No. 28-2.)  He maintains that he was not "involved in or aware of, the

circumstances under which the DEA Cleveland Resident Office began to work collaboratively with

the Richland County Sheriff's Office."  (*Id.* ¶ 7.)  He further maintains that he was never involved

in the decision to use Bray as an informant or Bray's supervision itself.  (*Id.* ¶¶ 8-9.)  In fact, he

states that he was not aware of Operation Turnaround at all.

Plaintiff argues that Corso would have known about Bray, Lucas, Cross, and Verhiley's

actions because DEA regulations require distribution of investigative reports and reporting to

supervisors.  Regulations also require the Special Agent in Charge to review all active informants

on a quarterly basis.  Section 6612.62B of the DEA Agents Manual states:

> On a quarterly basis, the SAC [Special Agent in Charge] (or ASAC)
> shall conduct a review of all active informants with the supervisors
> under his command. This review will cover the following points:
> 1. Whether these informants should remain in an active status.
> 2. Whether these informants are being appropriately targeted and
> utilized.
> 3. Whether the debriefings have been complete and fully reported.
> 4. Whether the appropriate initial or ongoing approval requirements are
> being met.
> After completion of this review, the SAC/CA shall certify in a brief
> memorandum to AO entitled 'Quarterly Review of Informants' that this
> review has been completed.

-25-

Plaintiff argues that Corso must not have reviewed records reviewing Bray, and that as a result, he is liable for failing to properly supervise the investigation.  Defendant Corso, in his Reply Brief, argues that Plaintiff's citation to certain DEA regulations do not meet the requirements of Rule 56 and that merely showing that DEA internal regulations require specific supervision of informants does not show that Corso is liable as a supervisor.  Other than showing that pursuant to DEA regulations, Bray did not constitute an ideal informant and that DEA supervisors are responsible for reviewing use of informants, Plaintiff has put forth no evidence that, if true, would show that Corso "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300 (quoting *Hays*, 668 F.2d at 874).  Further, Plaintiff has put forth no evidence that Corso "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (internal citation omitted).

Even if Plaintiff could show that Corso's actions or inactions met the legal requirement for supervisory liability, Plaintiff has not connected Corso to activity that would make him liable for the malicious prosecution claim.  As has been repeated throughout this Order, unless Plaintiff can show that a Defendant provided false evidence to the grand jury, an indictment from a grand jury serves as *prima facie* evidence of probable cause.  Summary judgment is hereby granted in favor of Defendant Corso.

### b.  Anthony Marotta

Defendant Marotta is also a DEA Special Agent in Charge of the DEA's Detroit Field Division.  He makes the same arguments as Defendant Corso.  Given that Marotta is in a similar position as Corso, the same analysis that applied to Corso above, applies to Marotta.  Thus, summary judgment is granted in favor of Defendant Marotta.

### c. Karen Tandy

Defendant Tandy is a former DEA Administrator. She held this position until November 2007. She makes the same arguments as Defendants Corso and Marotta. Also, Plaintiff to dismissed her from the case in his Amended Complaint. Given that Tandy is in a similar position as Corso and Marotta, the same analysis applied to these Defendants above, applies to Tandy. Thus summary judgment is granted in favor of Defendant Tandy.

### d.  John Ferster

Defendant Ferster is a DEA Group Supervisor and Acting Resident Agent in Charge of the DEA's Cleveland Resident Office.  He supervised the DEA Task Force that was involved in the investigation and prosecution of Williams.  (Ferster Decl., ¶¶ 12-14, ECF No. 28-4.)  Ferster maintains, however, that he was not involved in the direct supervision of Bray as an informant or involved in the supervision of Bray's unconstitutional or criminal actions or the alleged constitutional violations perpetrated by Defendants Lucas, Cross, or Verhiley.

Ferster argues that his supervisory participation in the investigations and prosecutions solely involved his review of DEA Form 6's.  These were written reports, prepared by DEA Special Agents, which described some of the events that occurred in the respective investigations and prosecutions. (Ferster Decl., ¶ 19, ECF No. 28-4.)  Ferster argues that none of the DEA Form 6's that he reviewed indicated any unconstitutional actions of Defendants Lucas, Cross, or Verhiley.  However, Lucas's reports of the buys that occurred on October 5, 2005, were signed and approved by Defendant Ferster.  (Ex. 2, Sealed Docs., at 002866, 002869, 017831.)  In addition, the report detailing Lucas and police officer Jamaal Ansari's interview of Williams after his arrest, in which they learned that

he had been on an airplane during the alleged drug buy on October 5, 2005, was designated for Ferster's approval. (Ex. 2, Sealed Docs. at 010511.)

If Lucas's reports were presented to the grand jury, then it is possible that Ferster could be liable for malicious prosecution, as he signed these reports. This could be evidence of implicit authorization or approval of unconstitutional conduct. *See Shehee*, 199 F.3d at 300 (quoting *Hays*, 668 F.2d at 874). It is not clear at this juncture whether the evidence in the reports was such as to aller Ferster to potential fabrication and violation of Williams's constitutional rights. Thus, Ferster is not entitled to qualified immunity at this juncture.

### 4. Defendant Robert Cross

Cross maintains that he was only limitedly involved with the investigation, prosecution, and conviction of Williams. According to Cross, he was involved with the October 5, 2005 drug transaction but was not involved with the July or August transactions. His involvement with the October buy included:

> (1) conducting surveillance; (2) taking joint physical custody with DEA Special Agent Lucas of the crack cocaine that was purchased and thereafter transporting it to the DEA laboratory for analysis and safekeeping; and (3) taking custody of a CD of the events of October 5, 2005 that had been prepared by the Richland County Sheriff's Office and delivering the CD to the DEA's Cleveland Residence Office Non-Drug Evidence Custodian for storage and safekeeping.

(Def. Cross's Mot. for Summ. Judg., at 11–12, ECF No. 30.) Cross did not testify before the grand jury in Williams's case. (Corss Decl., ¶ 15, ECF No. 30-1.) Cross did not participate in Williams's arrest. (*Id*. ¶ 16.) Cross did not participate in Williams's arraignment. (*Id*. ¶ 17.) Cross was not involved with the judicial proceeding that resulted in the issuance of an Order of Temporary Detention for Williams, nor did he participate in the judicial proceeding that resulted in the issuance of an Order of Detention Pending Trial. (*Id*. ¶¶ 18, 19.) Cross did not participate in the proceeding

during which Williams proffered a plea of guilty to Count 1, and Cross did not participate in Williams's sentencing proceeding.  (*Id*. ¶¶ 21, 24.)

In response, Plaintiff argues that Cross was involved with the October 5, 2005 drug transaction.  Plaintiff does not maintain that Cross was involved in Williams's case beyond that. Therefore, Cross is entitled to summary judgment on the malicious prosecution claim, as Plaintiff has not alleged or presented evidence that Cross testified before the grand jury or falsified evidence that was later presented to the grand jury.

### 5.  Defendant Thomas Verihiley

At the time of the events alleged in this lawsuit, Verhiley was a DEA Task Force Officer to the DEA's Cleveland Resident Office in Cleveland, Ohio.  Verhiley acknowledges that he conducted surveillance during the October 5, 2005 drug transaction.  Verhiley maintains that he had no involvement with Williams's Indictment, arrest, arraignment, temporary detention, detention pending trial, proffer, proffer of the guilty plea, or sentencing.  (Verhiley Decl., ¶¶ 12–18, 21, ECF No. 31-1.)

There is no evidence that Verhiley made statements in front of the grand jury or had evidence created by him presented to the grand jury.  Therefore, the court finds that Verhiley is entitled to summary judgment on the malicious prosecution claim.

### 6.  Defendant Sheriff J. Steve Sheldon

Defendant Sheldon argues that he is entitled to the protection of qualified immunity because he did not participate in the investigation of Plaintiff's criminal activity.  He maintains that he was not involved with any of the controlled buys to Williams and that he did not identify Williams as ever being involved in any of the controlled drug buys.  (Sheldon Aff., ¶¶ 8, 9.)  Sheldon further argues that he did not participate in framing Williams or conspire to do so.

Plaintiff argues in response that Sheriff Sheldon participated with Defendants Metcalf, Mayer, and Faith in the decision to use Bray as a confidential operative.  (Ex. 1, Lucas Tr. at 1155-52.) Plaintiff further argues that it was Sheldon's decision to exclude METRICH, a regional drug task force, from the operation, but it appears that METRICH remained involved to some extent (Ex. 1, Lucas Tr. at 1537 ("Q. Now, when these Mansfield cases were taken down in November of 2005, was METRICH there to effect the arrests and do the search warrants? A. Yes.").)

However, regardless of METRICH's continuing involvement in the overall operations, there is no evidence that Sheldon was involved in the October 2005 drug transaction.  Summary judgment is hereby granted in his favor.

### 7.  Defendant Captain Larry Faith

Defendant Faith argues that his involvement with Williams's case was limited.  He argues the following:

> [o]n July 19, 2005, Captain Faith provided surveillance for the controlled drug buy. (Exhibit A, at ¶9). Captain Faith observed a blue Chrysler van with Ohio registration that he recognized as being driven by Roosevelt Williams. (Exhibit A, at ¶10). Captain Faith observed Bray climb intro the driver's seat of the van and witnessed the drug buy. (Exhibit A, at ¶11). Captain Faith and Sergeant Mayer then followed Bray back to the Richland County Sheriff's Office after Bray exited the van. Id. On August 4, 2005, Captain Faith provided Bray with $300.00 for the drug buy. (Exhibit A, at ¶12). Apart from that, Captain Faith's only involvement with this drug buy was to work the cobble phones and to take a voluntary statement from Bray. (Exhibit A, at ¶12 and 15). Captain Faith did not identify Roosevelt Williams as being involved with the August 4, 2005 drug buy.  (Exhibit A, at ¶13). When Bray returned to the Richland County Sheriff's Office, Captain Faith showed a picture of Roosevelt Williams to Jerrell Bray, and Bray said that's the person he made the purchase from on August 4, 2005 and July 19, 2005. (Exhibit A, at ¶14). Captain Faith's only involvement with respect to the October 5, 2005 drug buy was to work the cobble phones. (Exhibit A, at ¶16). Captain Faith did not identify Roosevelt Williams as being involved in the October 5, 2005 drug buy. (Exhibit A, at ¶17).

-30-

(Def. Faith's Mot. for Summ. J., at 4, ECF No. 33.)  Faith further argues that he did not make any recommendation in regard to what federal charges should be sought and that he did not testify before the federal grand jury.  (Faith Aff., ¶¶ 18-19, ECF No. 33-1.)

Plaintiff argues in response that Defendant Faith made the recordings of both the phone "direct connect" conversation and the audio recording of the October 2005 buy.  (Ex. 2, Sealed Docs., at 017832.)  Plaintiff further argues that Faith handled communications with Officer Wheeler when Wheeler came forward to report that the drug seller at the October 2005 was not Williams. However, Plaintiff presents no evidence that Faith testified before the grand jury or that any report Faith allegedly created was shown to the grand jury.  Without this, Plaintiff cannot overcome the presumption of probable cause created by a grand jury indictment.  *Higgason*, 288 F.3d at 877.  The court finds that Faith is entitled to qualified immunity on the malicious prosecution claim.

### 8.  Sergeant Matt Mayer

Defendant Mayer is a detective at the Richland County Sheriff's Office.  He argues that Mayer's involvement with Williams's case was limited.  He states that:

> [o]n July 19, 2005, Sergeant Mayer provided surveillance and videotaped the controlled drug buy. (Exhibit A, at ¶9). After the buy was over, Sergeant Mayer followed Bray back to the Richland County Sheriff's Office. (Exhibit A, at ¶10). Sergeant Mayer had no role with respect to the controlled buy on August 4, 2005.  (Exhibit A, at ¶11). Furthermore, Sergeant Mayer had no involvement with the drug buy on October 5, 2005. (Exhibit A, at ¶12). Sergeant Mayer did not identify Roosevelt Williams as being involved in any of the buys. (Exhibit A, at ¶¶ 9, 11, and 12).

(Def. Mayer 's Mot. for Summ. J., at 4,  ECF No. 34.)  Mayer further argues that he did not make any recommendation in regard to what federal charges should be sought and that he did not testify before the grand jury.  (Mayer Aff., ¶¶ 13-14, ECF No. 34-1.)

Plaintiff argues in response that Mayer was aware that Bray fabricated evidence in past drug transactions and that Mayer was in charge of supervising Bray.  Although Plaintiff presents evidence supporting a claim that Mayer was involved or was aware of Bray's wrongful conduct in past operations, Plaintiff does not present evidence that Mayer was involved with or aware of any wrongdoing in regard to the October 2005 drug transaction.  Therefore, Plaintiff cannot prevail on a claim that Mayer was directly involved with maliciously prosecuting Williams for the October 5, 2005 transaction.  As for Plaintiff's claim that Mayer is liable in a supervisory capacity, Plaintiff has put forth evidence that Mayer supervised past drug transactions that Bray was a part of, but Plaintiff has put forth no evidence that Mayer "either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Shehee*, 199 F.3d at 300 (internal citation omitted).  Even if Plaintiff could show that Mayer supervised Bray during the October 2005 drug transaction, Plaintiff has not shown that Mayer had any responsibility for evidence presented to the grand jury.  Without this, Plaintiff cannot succeed on a malicious prosecution claim against Mayer.  Summary judgment is hereby granted in Defendant Mayer's favor.

## IV.  CONCLUSION

For the foregoing reasons, the court hereby grants the following summary judgment motions in their entirety: (1) Defendant Robert Cross's Motion for Summary Judgment with Respect to *Bivens* Claims (ECF No. 30), (2) Defendant Thomas Verihiley's Motion for Summary Judgment with Respect to *Bivens* Claims (ECF No. 31), (3) Defendant Sheriff J. Steve Sheldon's Motion for Summary Judgment (ECF No. 32), (4) Defendant Captain Larry Faith's Motion for Summary Judgment (ECF No. 33), (5) Defendant Sergeant Matt Mayer's Motion for Summary Judgment (ECF No. 34), and (6) Defendant Charles Metcalf's Motion for Summary Judgment (ECF No. 35.)

-32-

The court grants in part and denies in part the following summary judgment motions: (1) Defendants Robert L. Corso, John Ferster, Anthony C. Marotta, and Karen P. Tandy's Motion for Summary Judgment (ECF No. 28) and (2) Defendant Lee Lucas's Motion for Summary Judgment and/or Motion to Dismiss on Qualified Immunity Grounds (ECF No. 29.)

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

September 30, 2011

-33-